UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PAUL D. VAN ORDEN,

               Plaintiff,          10-CV-6061

v.                                                            **DECISION**
                                                              **And ORDER**

MICHAEL ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
               Defendant.

_____

Introduction

    Plaintiff, Paul D. Van Orden ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision by the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). Plaintiff applied for DIB under Title II of the Social Security Act ("the Act") for a period of disability and disability insurance benefits alleging disability beginning September 9, 2005. Plaintiff moves for judgment on the pleadings alleging that the decision of the Administrative Law Judge, Wallace Tannenbaum ("ALJ"), that the Plaintiff was not disabled within the meaning of Act, was not supported by substantial evidence in the record. The Plaintiff asserts that, for the aforementioned reasons, the ALJ's decisions should be reversed.

    The Commissioner moves for judgment on the pleadings claiming that the decision of the ALJ is supported by substantial evidence and should be affirmed. After reviewing the entire record, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record. Therefore, for the reasons set

forth below, the Commissioner's motion for judgement on the pleadings is granted, and the Plaintiff's motion is denied.

Background

On October 2, 2006, Plaintiff applied for DIB alleging disability due to degenerative arthritis of the knees(bilaterally), bilateral meniscal tears, hereditary peripheral neuropathy palsy with predisposition to pressure palsies, bilateral carpal tunnel syndrome, sleep apnea and hypothyroidism. Plaintiff was born June 27, 1969. Plaintiff completed one year of college, and previously worked as a business and finance manager, general manager of a fast-food restaurant, grounds keeper, sales consultant, and a soldier in the U.S. Army.

Plaintiff's application was initially denied on April 4, 2007, and Plaintiff timely filed a request for a hearing before an ALJ. The hearing took place on May 7, 2009 by video. Plaintiff appeared in Rochester, New York with his attorney, and the ALJ presided over the hearing from New York City. In a decision dated June 15, 2009, the ALJ found that Plaintiff was not disabled within the meaning of the Act. This decision became final when the Appeals Council affirmed the decision of the ALJ on January 6, 2010. Plaintiff then filed this action seeking review of the Commissioner's decision. The issue is whether the claimant is disabled under § 216 (i) and § 223(d) of the Act.

Discussion

I.  Jurisdiction and Scope of Review

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Matthews v. Eldridge, 424 U.S. 319, 320 (1976).  When considering such a claim, the court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record.  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  Section 405(g) thus limits the court's scope of review to determining whether or not the Commissioner's findings are supported by substantial evidence. See Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (finding that the reviewing court does not try a benefits case de novo).

While the court must act as "more than an uncritical rubber stamp," it must not "decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the [Commissioner]." Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986); Sitarek v. Shalala, 92-CV-641S, 1994 U.S. Dist. LEXIS 5851 (W.D.N.Y. April 21, 1994).  The Commissioner's findings are not subject to reversal merely because two inconsistent conclusions could be drawn from the evidence, so long as his particular finding is supported by substantial evidence.  See, e.g., NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299-300 (1939); Walker v. Bowen, 834

3

F.2d 635, 640 (7th Cir. 1987)("where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary").

The court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached." Lynn v. Schweiker, 565 F. Supp. 265, 267 (S.D. Tex.1983) (citation omitted). The Commissioner contends that his decision was reasonable and is supported by the evidence in the record, and moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Judgment on the pleadings may be granted under Rule 12(c) where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639 (2d Cir. 1988). If, after a review of the pleadings, the court is convinced that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief, judgment on the pleadings may be appropriate. See, Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

II. There is Substantial Evidence in the Record to Support the Commissioner's Decision that the Plaintiff was not Disabled Within the Meaning of the Act.

The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months..." 42 U.S.C. § 423(d)(1)(A). An individual will only be considered "under a disability" if his impairment is so severe that he is both unable to do his previous work and unable to engage in any other kind of substantial gainful work that exists in the national economy. §§ 423(d)(2)(A).

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims. (Transcript 18-19) (hereinafter "Tr."). The five-step analysis requires the ALJ to consider the following:

(1) Whether the claimant is currently engaged in substantial gainful activity;

(2) if not, whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities;

(3) if the claimant suffers a severe impairment, the ALJ considers whether the claimant has an impairment which is listed in Appendix 1, Subpart P, Regulation No. 4, if so, the claimant is presumed disabled;

(4) if not, the ALJ considers whether the impairment prevents the claimant from doing past relevant work;

(5) if the claimant's impairments prevent him from doing past relevant work, if other work exists in significant numbers in the national economy that accommodate the

5

claimant's residual functional capacity ("RFC") and vocational factors, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(I)-(v) and 416.920(a)(4)(I)-(v).

Here, the ALJ found that (1) the Plaintiff met the insured status requirements of the Act and that he has not engaged in substantial gainful activity since September 9, 2005, the alleged onset date; (2) the Plaintiff has the following severe impairments: degenerative arthritis of the knees (bilaterally), bilateral meniscal tears, hereditary peripheral neuropathy palsy with predisposition to pressure palsies, bilateral carpal tunnel syndrome, sleep apnea and hypothyroidism; (3) these impairments either singularly or combined do not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, subpart P, Appendix 1; (4) the Plaintiff cannot perform any past relevant work; and (5) the Plaintiff has the RFC to perform a full range of sedentary work as defined in 20 C.F.R. 404.1567(a). The ALJ found that the claimant can lift and carry no more than 10 pounds at a time, can sit a total of approximately 6 hours out of an 8-hour work day, and use his hands and fingers for fine manipulation. (Tr. at 21). The ALJ found that the Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms of which he complains. However, his statements concerning the intensity, persistence, and limiting effect of the symptoms are not credible, since the Plaintiff's allegations that he is unable

to work due to pain and numbness in his arms and knees are not supported by evidence in the record. (Tr. at 19-20).

    A.   <u>The Medical Evidence</u>

On September 29, 2005, Plaintiff was referred to Dr. John P. Goldblatt for an evaluation of his left knee (Tr. at 176). Plaintiff complained of pain from twisting his left knee and a recent magnetic resonance imaging ("MRI") revealed a medial meniscus tear. <u>Id.</u> Upon examination, Plaintiff had full range of motion in his neck, hip and ankles, and limited range of motion in the left knee. <u>Id.</u> Plaintiff elected to have arthroscopy on the knee on October 7, 2005. (Tr. at 180). Dr. Goldblatt saw Plaintiff again on October 19, 2005 for post surgery follow-up.(Tr. at 175). Dr. Goldblatt then prescribed keflox after finding that there was "persistent drainage at a portal." <u>Id.</u> In November 2005, the persistent drainage at the portal was resolved, Plaintiff was undergoing physical therapy and was "beginning to progress." (Tr. at 174). Dr. Goldblatt opined that Plaintiff "will do well once he progresses to a comfortable range of motion." <u>Id.</u>

The Plaintiff was diagnosed with sleep apnea in May 2006, after an overnight polysommogram by Dr. Donald D. Greenblatt. (Tr. at 192). Plaintiff complained of loud snoring, unrefreshing sleep, and daytime sleepiness. Upon examination, Plaintiff could walk without difficulty and with a normal gait. (Tr. at 198). Dr. Greenblatt noted that Plaintiff's complaints indicated sleep apnea and ordered the polysommogram. <u>Id.</u> Dr. Greenblatt

saw Plaintiff again on June 6, 2006, and arranged a trial with a continuous positive airway pressure ("CPAP") machine on June 21, 2006, to treat Plaintiff's sleep apnea.(Tr. at 192). On July 5, 2006, Dr. Greenblatt opined that the CPAP machine "was effective in preventing abnormal breathing episodes and should be well tolerated by the Plaintiff." (Tr. at 188). Dr. Goldblatt instructed Plaintiff on the use and maintenance of the CPAP machine at home, and advised Plaintiff to use it nightly. Id.

On June 14, 2006, Dr. Peter J. Ronchetti evaluated the Plaintiff for numbness and tingling of the left hand. (Tr. at 168). Dr. Ronchetti noted that Plaintiff had hereditary neuropathy in his hands and feet. Id. (Dr. Ronchetti had previously treated Plaintiff for a right carpal tunnel release from which he recovered well) Id. Upon examination, Plaintiff had very slight wasting at the thenar, positive tinel signs, and "decreased fine touch at the thumb index and middle finger." Id. Dr. Ronchetti noted that an electromyography ("EMG")performed in 2004 indicated carpal tunnel syndrome, and diagnosed Plaintiff with carpal tunnel syndrome. Id. Dr. Ronchetti opined that Plaintiff would benefit from carpal tunnel release surgery, and Plaintiff agreed. Id. The carpal tunnel release surgery of the left hand was performed on June 20, 2006. (Tr. at 169). Although there was still some paresthesias, it was significantly diminished. Id. Plaintiff was healing well and had full motion of the fingers. (Id.)

8

Plaintiff saw Dr. John P. Goldblatt again on June 23, 2006. Plaintiff complained of pain after slipping in the shower. (Tr. 173). Dr. Goldblatt noted a potential retear of the meniscus, and ordered an MRI. Id. The MRI indicated that there was post surgical change in the medial meniscus, but was inconclusive as to whether a new tear was present. (Tr. at 172). On July 17, 2006, Plaintiff had a left knee arthroscopic partial meniscectomy. (Tr. at 178-79). On July 27, 2006, Plaintiff saw Dr. Goldblatt for a post surgery follow-up. (Tr. at 171). Dr. Goldblatt opined that Plaintiff would benefit from the arthroscopy, and recommended physical therapy. Id.

Plaintiff was evaluated by Dr. Anne Moss, a neurologist on September 28, 2006. (Tr. at 162). Plaintiff complained of numbness in his right thigh and occasional numbness and tingling in his right foot. Id. Upon examination, Plaintiff's "muscle bulk was well preserved," and there was "perhaps very slight weakness" on the left side. Id. Plaintiff was also able to walk on his heels and toes, and pinprick sensations in the right median had diminished. Id. Nerve-conduction studies revealed a marked improvement in median nerve function compared to 2004, and the terminal latency and amplitude had improved. (Tr. at 162-63) Dr. Moss assessed meralgia paresthetica and noted that, although the ulnar nerves remained of concern, they have remained stable.(Tr. at 163). She also noted that the median nerves were better clinically and electrodiagnostically and motor strength had been well maintained. Id.

Plaintiff saw Dr. Moss again on June 25, 2007, for pain in the right hand that resulted from flipping sausage. (Tr. at 160). Dr. Moss noted that his muscle bulk was well preserved, he had grade four strength in his median, ulnar, and radial muscles bilaterally, the muscles of his feet were strong, and the pinprick sensation in his right hand had reduced. Id. Dr. Moss ordered nerve conduction tests and fitted Plaintiff with a wrist splint. Id. On June 27, 2007, the results from the nerve conduction study indicated that Plaintiff's median neuropathy had worsened. (Tr. at 156). Dr. Moss instructed Plaintiff to continue wearing the wrist splint. Id.

On July 7, 2007, Plaintiff again saw Dr. Goldblatt who diagnosed him with peripheral neuropathy. (Tr. at 152). Dr. Goldblatt noted there was no indication of a new tear, that two athroscopies had been performed, but Plaintiff had not responded significantly. Id. He prescribed Relafen and recommended that Plaintiff wear a lateral heel and sole wedge.

Dr. Goldblatt saw Plaintiff again on September 12, 2007. (Tr. at 153). Dr. Goldblatt noted that although Plaintiff continued to have medial-based left knee pain, he was able to engage in elliptical, stair climber, and stationery bike exercises. Id. He prescribed anti-inflammatory medication with Relafen. Id. He again advised Plaintiff to wear a lateral heal and sole wedge, which Plaintiff had not done. Id.

On September 27, 2007, Dr. Moss reported that Plaintiff had been wearing his wrist splints, and the numbness in his hands had improved greatly. (Tr. at 142). She noted the muscle bulk was well preserved and his muscle was at least at grade four strength. Id. The pinprick sensation in both hands had also been reduced. Id. Dr. Moss opined that compared to his last visit of just two months, Plaintiff's neuropathy had improved clinically and electrodiagnostically. Id.

Dr. Goldblatt saw Plaintiff again on November 8, 2007, and evaluated progressive arthritic change status in the left knee. (Tr. at 154). He noted that Relafen and the lateral heal and sole wedge had not relieved Plaintiff's symptoms. Id. He administered a corticosteroid injection. Id.

On October 16, 2000, Dr. Goldblatt evaluated Plaintiff for pain in the right knee.(Tr. at 139). Upon examination, Plaintiff had pain free range of motion of the right hip and ankle, and restricted range in the right knee. He assessed a meniscus tear to the right knee and ordered an MRI. Id. The MRI revealed a symptomatic medial meniscus tear of the right knee, and Plaintiff elected to have surgery. (Tr. at 138).

On October 3, 2008, Dr. Goldblatt performed a right knee arthroscopic partial medial and lateral meniscectomy. (Tr. at 136-37). On October 16, Dr. Goldblatt examined Plaintiff and noted that although Plaintiff was feeling well and had no issues with the surgery on his right knee, he had weightbearing pain in his left

11

knee. (Tr. at 134). Dr. Goldblatt assesed that Plaintiff's left knee had an early arthritic change, a known meniscus tear, and proximal tibial injury. Id. Dr. Goldblatt ordered an x-ray of the left knee. (Tr. at 124). The x-ray did not indicate a fracture, and there was no dislocation or arthritic change. Id. Dr. Goldblatt saw Plaintiff again on January 6, 2009, for left-knee pain. He fitted Plaintiff with a left knee brace. (Tr. at 133).

On June 24, 2008, Dr. Sirotenko diagnosed Plaintiff with hyperthyroidism, and prescribed medication. (Tr. at 118-119).

Plaintiff next saw Dr. Moss on December 8, 2008. (Tr. at 126-29). Upon examination, although Plaintiff had minimal muscle weakness, he had normal proximal strength throughout. (Tr. at 126). The nerve-conduction studies indicated a marked change in the left ulnar nerve. Id. Dr. Moss opined that although Plaintiff remained moderately weak, he had "recovered a good deal from his left ulnar nerve injury." (Tr. at 127).

In April 2009, Dr. Moss opined that Plaintiff could sit for only 15 minutes at a time before needing to change position by walking about, and could sit for a total of 4 hours in an 8-hour work day. (Tr. at 102). She stated that Plaintiff could stand and walk for 30 minutes at a time before needing to sit again, and could stand for a total of two hours in an 8-hour day. (Tr. at 103). Dr. Moss also opined that due to a predisposition to nerve injuries, Plaintiff would need rest breaks in addition to a morning break, a lunch period, and an afternoon break scheduled at

approximately two hour intervals. Id. She noted that Plaintiff could only occasionally lift 1-5 pounds and rarely or never lift any greater weight.(Tr. at 104). Additionally, Plaintiff could rarely balance or stoop, and would intermittently have motor and sensory deficits that would variably impact his ability to reach, push, and pull (Tr. at 105). She also opined that Plaintiff's impairments restricted him from several environmental conditions, such as heights, dust, or noise. (Tr. at 106). Dr. Moss stated that her evaluation of Plaintiff's ability was based on her diagnosis of hereditary neuropathy with predisposition to pressure palsies. (Tr. at 107).

> B. The ALJ Properly Considered the Opinion of Drs. John P. Goldblatt and Anne Moss.

Plaintiff argues that the ALJ did not give proper weight to the opinions of his treating physicians, Dr. Moss and Dr. Goldblatt. The ALJ determined that the treating physicians' opinions were not supported by examination findings and were not consistent with the record as a whole. (Tr. at 20).

The opinion of a treating physician is controlling only if it is well supported by medically acceptable clinical and diagnostic techniques and is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); See Schisler v. Heckler, 787 F.2d 76, 81 (2d Cir. 1986). This is because a treating physician generally has observed the patient over a long period of time and can give a detailed medical history. Salisbury v. Astrue, 06-CV-

6629L, 2008 U.S. Dist. LEXIS 97618 * 10 (W.D.N.Y. Dec. 2, 2008). When deciding whether to give a treating physician controlling weight, the ALJ must consider (1) whether a treatment relationship exists; (2) the length and nature of the treatment relationship; (3) the support for the opinion from medical and laboratory findings; (4) the consistency with the record as a whole; (5) specialization of the treating physician; and (6) other evidence that supports or contradicts the opinion. Id. The ALJ must also provide an explanation supporting his determination. § 404.1527(d)(2).

Here, the ALJ gave little weight to the opinions of Dr. Moss and Dr. Greenblatt and determined that, "[d]espite [Plaintiff's] diagnoses and complaints, there were no limitations placed on the [his] ability to function until after he applied for disability benefits." (Tr. at 20). The ALJ notes that Dr. Goldblatt began seeing Plaintiff in September 2005, performed both of his knee surgeries, and continued to see the Plaintiff through October 2008. Id. While this treatment relationship lasted for a significant time, the ALJ found Dr. Goldblatt's July 10, 2007 report, stating that Plaintiff's peripheral neuropathy justified his request for disability, was inconsistent with the medical record. Id. For example, although Plaintiff's complaint of pain in his knees was corroborated by occasional swelling, tenderness, and limited range of motion, Dr. Goldblatt did not place any limitations on Plaintiff's ability to function until after he applied for

14

disability benefits. Id. In fact, the ALJ noted that on September 12, 2007, just one month after his statement that Plaintiff's application for disability benefits was justified, Dr. Goldblatt reported that the "claimant was able to participate in elliptical, stair climbing, and stationery bike activities." Id.

This Court finds the ALJ's decision to give little weight to the opinion of Dr. Goldblatt reasonable because it is inconsistent with his previous and subsequent medical notes. After he performed the right knee arthroscopic partial medial and lateral meniscectomy in October 2008, he noted that Plaintiff was feeling well, and had no issues with his right knee (Tr. at 134). Although, Plaintiff had weightbearing pain in his left knee, a subsequent x-ray did not indicate a fracture, there was no dislocation or arthritic change, and Dr. Goldblatt fitted Plaintiff with a left knee brace. (Tr. at 133).

The ALJ notes that Dr. Moss began seeing Plaintiff as early as September of 2008. (Tr. a 20). However, she did not note any limitations until April of 2009. Id. The ALJ found Dr. Moss's RFC report, dated April 2, 2009, inconsistent with the medical record, and unsupported by examination findings. (Tr. at 21). This RFC report listed environmental limitations, several limitations regarding lifting more than five pounds, the length of time Plaintiff could stand or walk, and the number of required rest periods.(Tr. at 102-07). These limitations were not mentioned in Moss's previous notes.

15

Although the ALJ gave little weight to Dr. Moss's RFC report that Plaintiff is able to perform less than the full range of sedentary work, he "gave some weight to the examination findings in [the other] reports." (Tr. at 21). Thus, the ALJ found that the Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms of which he complains.

This Court finds that the ALJ's decision to give little weight to the report that Plaintiff is able to perform less than the full range of sedentary work is supported by the record. While Dr. Moss's examination of Plaintiff on June 27, 2007, indicated that his condition worsened, other examination findings on September 28, 2006, September 27, 2007, and December 8, 2008, respectively, indicated that Plaintiff's condition improved or was stable. (See Tr. at 127, 142, 163). Moreover, Plaintiff later refuted her opinion that his impairments restricted him from several environmental conditions, and agreed that her statement that he will never work again was exaggerated. (Tr. at 255).

Plaintiff also argues that the ALJ did not accurately consider the Plaintiff's peripheral neuropathy in regard to his RFC. In making his RFC assessment, the ALJ determined that "due to his peripheral neuropathy, the claimant is limited in his ability to carry, stand, and walk." (Tr. at 21). However, the ALJ found that Plaintiff could perform sedentary work because he "underwent successful surgeries to both knees and hands." Id. The ALJ also found that Plaintiff was able to "perform some lifting, carrying,

16

pushing, and pulling as reflected by his ability to perform activities of daily living which required some exertional activity." Id. These activities include mowing the lawn, shopping, feeding the pets and grooming. Id. The ALJ found that Plaintiff was 36 years of age, he was a younger individual as defined in the regulations, and he had a high school education and could communicate in English. (Tr. at 22). Principally, the ALJ concluded that there was work in the national economy which considering Plaintiff's age, RFC, and past relevant work, was sedentary in nature that Plaintiff could perform. Id.

This Court finds that the ALJ's conclusion that Plaintiff can perform sedentary work is supported by substantial evidence in the record including Plaintiff's overall daily functioning and the medical evidence in the record.

## **CONCLUSION**

For the reasons set forth above, I grant the Commissioner's motion for judgment on the pleadings. Plaintiff's motion for judgment on the pleadings is denied, and Plaintiff's complaint is dismissed with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

S/Michael A. Telesca
_____
MICHAEL A. TELESCA
UNITED STATES DISTRICT JUDGE

DATED: January 13, 2011
      Rochester, New York